UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 07-12075-RGS

LOUIS J. FARRAH, II, Administrator of the
Estate of Alfonso Santana

v.

STEPHEN R. GONDELLA, MARK F. BLANCHARD,
and MARK RIVET

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

July 22, 2010

STEARNS, D. J.

On October 31, 2007, Louis J. Farrah, II, the Administrator of the Estate of Alfonso Santana, brought this wrongful death action against Massachusetts State Police troopers Stephen R. Gondella and Mark F. Blanchard, and Lawrence police officer Mark Rivet.[1] Farrah asserts claims for violations of 42 U.S.C. § 1983 (Count I); assault and battery/wrongful death (Counts III and IV); violations of the Massachusetts Civil Rights Act (MCRA), Mass. Gen. Laws ch. 12, §§ 11H and I (Count V); and common-law conspiracy (Count VI). Blanchard and Rivet both move for partial summary judgment.[2]

BACKGROUND

On October 19, 2005, defendants were working as part of the Essex County Drug

_____

[1]Farrah originally named numerous other State troopers and Lawrence police officers as defendants, who have since been voluntarily dismissed.

[2]For reasons unexplained, defendants do not move as to Count IV, the survival action derived from the assault and battery claim asserted in Count III. Farrah originally pled a survival action attendant to the section 1983 claim asserted in Count I, but the court dismissed it as superfluous on July 16, 2008. Count IV, however, remains pending.

Task Force.  The Task Force consisted of members of the Massachusetts State Police and the Lawrence Police Department.  After executing a search warrant on Water Street in Lawrence, Task Force members were instructed to proceed to Forest Street, approximately one mile away, and wait there for further orders.  Blanchard, Gondella, and Rivet traveled together to Forest Street.  Rivet then left to fetch lunch for the group.

While stationed at Forest Street, Blanchard observed a red sport utility vehicle (SUV) driving slowly towards the officers' location.  According to Blanchard, Gondella recognized the SUV from earlier surveillance on Water Street.  Gondella contacted Sergeant William Canty, his supervisor, who told him to stop and identify the driver of the SUV.

As Blanchard watched, the SUV pulled to the side of the street and the driver (Santana) got out.  Blanchard approached him in the vicinity of 49 Forest Street.  Blanchard identified himself as a State trooper and asked Santana for his driver's license and registration.  Santana produced a Massachusetts driver's license in the name of Hernan Rivera.  (It was later learned that Hernan Rivera was Santana's alias).  Santana returned to the driver's side of the SUV.  Blanchard stood beside him.

Blanchard relayed the information on the driver's license to Sergeant Canty.  He also told Canty that Santana appeared nervous and that his heart could be seen beating through his chest.  As he ended the conversation with Canty, Blanchard observed Santana place a white object in his mouth.[3]  Santana ignored Blanchard's order to spit it out and turned away.  Blanchard called to Gondella for assistance as he attempted to wrest the object from Santana's mouth.

---

[3]It was later determined that the object Santana placed into his mouth was a small amount of cocaine wrapped in a piece of a paper towel.

Blanchard and Gondella were unable to restrain Santana.  Blanchard called on Rivet (who had just returned with the lunches) for reinforcement.  Blanchard admits that in the effort to subdue Santana, "[t]wo different law enforcement officers punched Mr. Santana in the face one or two times each."   Blanchard's Statement of Facts (SOF) ¶ 16. (Blanchard denies being one of the officers who punched Santana).   Rivet admits to punching Santana in the face "one or two times."  Rivet's Mem. at 2.

As they placed Santana in handcuffs, the officers realized that he was no longer breathing.  They attempted to resuscitate him and called for an ambulance.  The efforts to revive Santana were unsuccessful.  An autopsy was later conducted by Dr. William Zane, who determined that Santana had died of acute and chronic cocaine abuse.  Zane Dep. at 50.  A second autopsy was performed by plaintiff's medical expert, Dr. Gerald Feigin.  He initially concluded that Santana had died of blunt force trauma to the head.[4]  Dr. Feigin later opined that Santana was killed by "the application of a carotid sleeper hold."  Feigin Dep. at 154.[5]

<u>Additional Testimony</u>

The plaintiff has supplemented the record with deposition testimony from numerous

---

[4]Dr. Feigin is currently the Medical Examiner for Camden, Gloucester, and Salem Counties in New Jersey.  He additionally is a Deputy Medical Examiner for the Armed Forces Institute of Pathology's Armed Forces Medical Examiners System.  From 1994 to 1998, he was Associate Chief Medical Examiner for the Commonwealth of Massachusetts. Feigin Rule 26 Rept. at 1-2.  There is no information in the record with regard to Dr. Zane.

[5]A carotid sleeper hold is a chokehold executed by wrapping an arm around a subject's neck with the crook of the elbow centered mid-neck.  By pinching the arm together, the carotid arteries and/or the jugular veins are compressed on both sides of the neck.  The hold is intended to induce unconsciousness if the subject does not submit to the hold.

3

witnesses.  According to Farrah, not only was Santana punched multiple times, but he was also kicked, his head banged into the pavement, and he was choked.  Resp. to Blanchard's SOF ¶ 16.  Marisol Soto, Santana's widow, testified that from the porch of her house she observed three people in a struggle and that "[t]he policeman is here on the left, he is holding his back with his body and his leg, the arm around [Santana's] neck.  First he gave him the fist on his head, the back of his head, he put his arm around his neck.  The other one was also hitting my husband, the one that was beating him was the white one."  Soto Dep. Vol. I at 99.  Soto additionally testified, "I saw when they were punching him.  I saw the[m]  kick him.  They were punching him with the intention of killing him.  Like he was dead."  Id. at 110.  Finally, Soto testified that she observed Santana "in a position like a dog. . . . They were holding like around the neck. . . . Alfonso was trying to get out. . . . Trying to defend himself.  Alfonso was screaming. . . . [His head was] on the ground.  The knees on the ground.  And the body of one of the policemen on top of him.  And on his head."  Id., Vol. II at 27, 29.  Soto identified Blanchard and Gondella as the two persons beating Santana.  She alleges that she saw them "pushing and pulling" Santana, who was "screaming in pain."  Id. at 31-34.[6]

At some point, other Lawrence police officers arrived.  Officer Christopher Bussey testified that upon his arrival, he saw Santana face down on the ground struggling to get up.  According to Bussey, Gondella was laying on top of Santana, while Blanchard and

---

[6]Rivet argues that even assuming that Soto's testimony is credible, there is no evidence that he (Rivet) was present during the early stages of the alleged beating.  It is undisputed that Blanchard and Gondella were the officers then involved, and that the struggle with Santana continued for some period of time before Rivet and other Lawrence police officers arrived at the scene.

Rivet stood in close proximity.  Bussey Dep. at 14-15.  Bussey heard Blanchard yell, "he has [stuff] in his mouth."  Bussey began to shout at Santana, telling him to "[s]top resisting, spit it out."  Id. at 17.  He saw Blanchard attempt to remove something from Santana's mouth with his fingers.  Id. at 18.  Bussey also observed Gondella with his arm crooked around Santana's neck.  Id.  According to Rivet, Blanchard told him to "get something to open [Santana's mouth]."  Rivet Dep. at 86.  Rivet tried to force Santana's mouth open with his hands, but failed.  Id. at 88.

Bussey testified that Rivet punched Santana twice in the face, and that the first punch drew blood.  Bussey Dep. at 21-22.  Rivet stated that he did so "to bring [Santana] into compliance, to stop struggling, and make it easier to retrieve the drugs."  Rivet Dep. at 94.  Rivet was concerned that Santana was destroying evidence.  Id. at 95.  Rivet testified that he first punched Santana in the nose to prevent him from harming himself by swallowing drugs, and that he punched Santana a second time because he "still wasn't complying."  Id. at 96.  After Rivet's second punch, Santana was "brought under control." Id. at 97.  Rivet testified that he did not realize that his two punches to the face might have caused Santana pain.  Id. at 113.  After punching Santana, Rivet continued the attempt to retrieve what was in Santana's mouth by using a pen.  Id. at 103.

At some point, Blanchard requested pepper spray.  Rivet Dep. at 90.  While Gondella's arm remained around Santana's neck, a patrolman (Demers) sprayed Santana in the face.   Bussey Dep. at 20-21; Rivet Dep. at 97.  Another  patrolman (Pennington) forced his handcuff key into Santana's mouth in an effort to keep it open.  Pennington Dep. at 28.  Rivet finally succeeded in extracting a piece of a paper towel from Santana's mouth. Rivet Dep. at 105.  Less than one minute after Santana was handcuffed, Bussey saw that

Santana was not breathing, had no pulse, and was cyanotic (with a purplish, bluish hue to his lips resulting from oxygen deprivation).  Bussey Dep. at 27-33.

## DISCUSSION

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-250 (1986).

### Count I (Section 1983) and Count III (Assault and Battery/Wrongful Death)

To establish liability under the Federal Civil Rights Act, 42 U.S.C. § 1983, a plaintiff must prove that defendants (1) were acting under color of law, and (2) deprived him of a right or privilege secured by the Constitution or laws of the United States.  See Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 621 (1st Cir. 2000).[7]  Farrah's section 1983 claim is based on an alleged violation of Santana's Fourth Amendment rights, stemming from the use of excessive force to pry open his mouth to recover the cocaine.  To make out an excessive force claim under section 1983, a plaintiff must show a termination of his freedom of movement "*through means intentionally applied*." Brower v. County of Inyo, 489 U.S. 593, 597 (1989) (emphasis in original).   Intentional action directed toward the acquisition of physical control of a plaintiff must be distinguished from "police action that

---

[7]That defendants were acting under color of state law is not disputed.  See West v. Atkins, 487 U.S. 42, 50 (1988).

simply *causes* a particular result." Landol-Rivera v. Cruz Cosme, 906 F.2d 791, 795 (1st Cir. 1990) (emphasis in original) (accidental shooting of a hostage). See also Gutierrez v. Mass. Bay Transp. Auth., 437 Mass. 396, 401 (2002) ("An accidental use of force, even if occurring during the course of an arrest or other physical restraint of a person, does not constitute a seizure because it is not a 'means intentionally applied' to obtain control of the arrestee.").

"*[A]ll* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest" are to be decided under a Fourth Amendment standard of reasonableness, the proper application of which "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 395, 396 (1989) (emphasis in original). The standard is an objective one: "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Id. at 397. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 396-397.

The analysis is confined to the totality of the circumstances known to the officers at the time the decision to use force was made. The fact that force was used is not, in and of itself, dispositive. "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some

degree of physical coercion or threat thereof to effect it." Id. at 396.  The issue rather is whether the amount of force used was reasonable under the circumstances. Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id.  See also Sherrod v. Berry, 856 F.2d 802, 805 (7th Cir. 1988) (en banc) (error to admit evidence gained after the fact that the deceased suspect was unarmed – "Were the rule otherwise, . . . the jury would possess more information than the officer possessed when he made the crucial decision.").

As is evident from the record, summary judgment on the section 1983 claim is precluded by a cluster of disputed facts centered on the confrontation between Santana and the defendant officers.  While Blanchard swears that he did not strike Santana, Soto testifies that she saw two officers (one of them apparently Blanchard) beating him while he lay on the ground.[8]  Rivet's concession that he punched Santana twice creates a potential of liability on his part.  Blanchard and Rivet do not contest that force was used to subdue Santana.  They do, however, argue that there is no evidence that any force they used caused Santana's death.  They point to the opinion of plaintiff's expert, Dr. Feigin, that Santana died as a result of the carotid sleeper hold applied by Gondella.  Dr. Feigin, however, also testified that the cause of death included blunt force trauma to the neck and head and, moreover, that the officers' combined punches "may have helped render [Santana] unconscious and more easily susceptible to being choked." Feigin Dep. at 155. Feigin's testimony, if credited by the jury, raises more than "some metaphysical doubt as

---

[8]The court notes that Soto's testimony is inconsistent in a material respect, as she at times makes reference to two officers beating Santana, while at other times she states that, "the *one* that beat him up" was tall with light hair.  Soto Dep. Vol. I at 102 (emphasis added).  The court cannot resolve this discrepancy; that task must be left to the jury.

to the material facts," Rivet's Mem. at 5, quoting <u>Matsushita Elec. Indus. Co. v. Zenith</u> <u>Radio Corp.</u>, 475 U.S. 574, 586 (1986), but rather a serious question as to whether Blanchard's and Rivet's punches contributed to Santana's death.

Alternatively, an officer who fails to take reasonable steps to protect the victim of another officer's use of excessive force may be held liable under section 1983 on a failure to intervene theory. <u>See</u> <u>Wilson v. Town of Mendon</u>, 294 F.3d 1, 6 (1st Cir. 2002). <u>See</u> <u>also</u> <u>United States v. Reese</u>, 2 F.3d 870, 890 (9th Cir. 1993) (supervising sergeant stood by and watched while officers under his command violently assaulted arrestee); <u>Gaudreault</u> <u>v. Municipality of Salem</u>, 923 F.2d 203, 207 n.3 (1st Cir. 1990) (officers failed to protect arrestee from fellow officer). <u>See</u> <u>also</u> <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 124 F.3d 123, 129 (2d Cir. 1997) (failure to intercede to prevent an unlawful arrest).

However, as Blanchard and Rivet argue, the "failure to intervene" rule applies only when an officer has "a realistic opportunity to intercede." <u>Davis v. Rennie</u>, 264 F.3d 86, 98 n.10 (1st Cir. 2001) (no basis for liability where an attack "was over in a matter of seconds"). Blanchard states that he "did not observe any law enforcement officer try to hurt Mr. Santana or use any force that he viewed as being unreasonable," Blanchard's Mem. at 6, and, moreover, that "[a]ny force that [he] saw used upon Mr. Santana was reasonable under the circumstances and consistent with the training that [he had] received." Blanchard Aff. ¶ 16. Blanchard and Rivet point to the depositions of other officers on the scene as buttressing their contention that a reasonable observer would not have seen a necessity to intercede. Bussey, for example, testified that he did not believe that Santana was being choked. Bussey Dep. at 35. Pennington stated that it did not occur to him that the effort to subdue Santana might be harming him. Pennington Dep. at 26. Rivet argues that there

9

is no evidence that he knew that Santana was being choked.

The court cannot, however, so conclude as a matter of law.  Unlike the incidents in Rennie and Gaudreault that were over in "a matter of seconds", 264 F. 3d at 98 n.10; 923 F.2d at 207 n.3, see also Wilson, 294 F.3d at 14 (same, "only a few seconds"), here the confrontation endured for an estimated ten minutes.  Similarly, the court cannot say as a matter of law that a reasonable jury could not find that excessive force was used, singly or jointly, by the defendants.  Compare Roy v. Inhabitants of City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994) (while a jury could have rationally found that the officer could have done a better job in subduing an armed and defiant plaintiff, "in our view a jury could not find that [the officer's] conduct was so deficient that no reasonable officer could have made the same choice [of resorting to deadly force].").

Accordingly, the motions for summary judgment on the section 1983 claim will be DENIED.[9]

_____

[9]The same analysis applies to the assault and battery/wrongful death claim. Massachusetts law provides that

> [a] person who (1) by his negligence causes the death of a person, or (2) by willful, wanton or reckless act causes the death of a person under such circumstances that the deceased could have recovered damages for personal injuries if his death had not resulted, . . . shall be liable in damages.

Mass. Gen. Laws ch. 229, § 2.  Under Massachusetts law, public employees are immune from suit based on allegedly negligent conduct.  Rather, liability for the negligent acts of a public employee committed within the scope of employment is visited upon the public employer, and not the employee.  See Mass. Gen. Laws ch. 258, § 2; Parker v. Chief Justice for Admin. and Mgmt. of the Trial Court, 67 Mass. App. Ct. 174, 178 (2006).  Public employers are not liable for claims arising directly out of an employee's intentional torts. Mass. Gen. Laws ch. 258, § 10(c).  See MacLean v. Delinsky, 407 Mass. 869, 878 n.6 (1990).  See also Tambolleo v. Town of W. Boylston, 34 Mass. App. Ct. 526, 533 (1993) (plaintiffs' presentment letter alleged only an intentional tort).  For purposes of the Tort Claims Act, "recklessness is considered negligent, rather than intentional conduct." Parker,

Count V – MCRA

To state a claim under the MCRA, a plaintiff must show that (1) his exercise or enjoyment of rights secured by the constitution or laws of either the United States or the Commonwealth of Massachusetts (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion. See Swanset Dev. Corp. v. City of Taunton, 423 Mass. 390, 395 (1996). The purpose of the MCRA is to provide under state law a remedy "coextensive with 42 U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart does not." Batchelder v. Allied Stores Corp., 393 Mass. 819, 822-823 (1985). The MCRA is remedial in nature. It creates no substantive rights. Mouradian v. Gen. Elec. Co., 23 Mass. App. Ct. 538, 543 (1987). Thus, in order "to seek redress through [MCRA as under its Federal analog, 42 U.S.C.] § 1983 . . . a plaintiff must assert the violation of a federal [or State] *right*, not merely a violation of federal [or State] *law*." Perkins v. Commonwealth, 52 Mass. App. Ct. 175, 181 (2001) (emphases in original), citing Blessing v. Freestone, 520 U.S. 329, 340 (1997).

---

67 Mass. App. Ct. at 180; Molinaro v. Town of Northbridge, 419 Mass. 278, 279 (1995) (same).

Section 4 of Chapter 258 bars any suit for damages against a public entity unless the plaintiff within two years of the date on which the cause of action accrued presents notice in writing to the agency's chief executive officer. See Gilmore v. Commonwealth, 417 Mass. 718, 721-722 (1994). "Presentment is . . . a statutory condition precedent to recovery under G.L. c. 258." Vasys v. Metro. Dist. Comm'n, 387 Mass. 51, 55 (1982). Strict compliance is the rule. Richardson v. Dailey, 424 Mass. 258, 261 (1997). The record does not indicate whether Farrah ever served a presentment letter. If no letter was served, he is held to proof of intentional conduct in order to recover at trial on this claim against the individual defendants. In any event, the court assumes that it has always been Farrah's intention to proceed on a theory of intentional conduct, as evidenced by the fact that the employers have not been named as defendants, and all defendants with a supervisory capacity have been voluntarily dismissed.

In deference to a legislative concern that the MCRA not be interpreted to create "a vast constitutional tort," the Act is "explicitly limited" to situations "where the derogation of secured rights occurs by threats, intimidation or coercion" involving a specific threat of harm "directed toward a particular individual or class of persons." Bally v. Northeastern Univ., 403 Mass. 713, 718-719 (1989).  For purposes of the MCRA, "[a] '[t]hreat' . . . involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. 'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct. . . . ['Coercion' involves] the application to another of such force, either physical or moral, as to constrain [a person] to do against his will something he would not otherwise have done." Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474 (1994) (internal citations and quotation marks omitted).

Defendants argue that they cannot be held liable under state law because "[a] punch alone, . . . even if it directly violated Santana's civil rights on the basis that it rose to the level of excessive force, would not constitute threats, intimidation or coercion for the purposes of the [MCRA]." Blanchard's Mem. at 8.  Defendants also argue that there is no evidence that they intended "to put fear" in Santana, or that they sought to constrain him from doing that which he was lawfully entitled to do.  "A direct violation of a person's rights does not by itself involve threats, intimidation, or coercion." Longval v. Comm'r of Corr., 404 Mass. 325, 333 (1989); Layne v. Superintendent, Mass. Corr. Inst., Cedar Junction, 406 Mass. 156, 158 (1989) (same).  Rather, to be actionable, a defendant's actions must amount to "an attempt to force someone to do something the person is not lawfully required to do." Freeman v. Planning Bd. of W. Boylston, 419 Mass. 548, 565 (1995).

Here, Farrah has pled a violation of Santana's Fourth Amendment right to be free

from excessive force.  What is absent, however, is any showing (or even pleading) that the violation was intended to coerce Santana into refraining from the exercise of a right or privilege secured by law.  There is no right under state or federal law to resist an arrest or search, even one that is illegal from its inception.  See Commonwealth v. Moreira, 388 Mass. 596, 601 (1983);[10] United States v. Simon, 409 F.2d 474, 477 (7th Cir. 1969).  Thus, on the MCRA claim, defendants are entitled to judgment as a matter of law.  See Orwat v. Maloney, 360 F. Supp. 2d 146, 164-165 (D. Mass. 2005).

Conspiracy

A plaintiff may allege one of two types of civil conspiracy.  The first type requires proof of coercion; the second requires proof of a common plan to commit a tortious act. Kurker v. Hill, 44 Mass. App. Ct. 184, 188 (1998).  Under the first type of conspiracy, a plaintiff must allege that the defendant and others combined to have a special coercive power that they did not possess individually.  Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1563 (1st Cir. 1994).  To state a claim for the second type of conspiracy, the plaintiff must allege "first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement." Id. at 1564.

Farrah proceeds on the second conspiracy theory, alleging that "[t]he individual officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during these

---

[10]The substance of Moreira's abandonment of the common-law doctrine of the right to resist an unlawful arrest is distilled in Mass. Gen. Laws ch. 268, § 32B(b).

events." Sec. Am. Compl. ¶ 24.[11]  Farrah notes that Blanchard was present for at least five minutes of the alleged assault, during which time Gondella lay on Santana, pinning him to the ground while applying a chokehold to his neck.   Blanchard, Gondella, and Rivet variously engaged in efforts to extract the cocaine from Santana's mouth, and, if Soto is to be credited, Blanchard took a direct part in the assault.   While this showing of concerted action may (if the evidence holds up at trial) be sufficient to submit Farrah's Fourth Amendment claim to the jury on a joint venture theory,[12] what is lacking is the showing (or pleading) of an anticipatory agreement, an essential element of common-law conspiracy. See Moss v. Camp Pemigewassett, Inc., 312 F.3d 503, 512 (1st Cir. 2002).   See also Commonwealth v. Cook, 10 Mass. App. Ct. 668, 673 (1980) ("[O]ne can be an accomplice aiding in the commission of a substantive offense without necessarily conspiring to commit it.").   Cf. Commonwealth v. Chhim, 447 Mass. 370, 380 (2006) (proof of a joint venture does not require evidence of advance planning).

<u>ORDER</u>

For the foregoing reasons, defendants' motions for summary judgment are ALLOWED as to Counts V and VI of the Complaint.   They are DENIED as to Counts I and

---

[11]To the extent that plaintiff intended to proceed under the first "coercive type" of conspiracy, the court notes that this is a "very limited cause of action in Massachusetts," requiring a plaintiff to plead that defendants had "some peculiar power of coercion" over Santana.  Aetna, 43 F.3d at 1564.   The court has assumed from the phrasing of the Complaint that Farrah is proceeding under the alternative theory of civil conspiracy, which is "more akin to a theory of common law joint liability in tort."  Id.

[12]See Wilson, 294 F.3d at 15 ("[W]e do not agree with appellees' argument that 'joint tort feasor' liability does not appear to exist under [section] 1983.").

III.[13]  Trial will commence at 9:00 a.m. on August 23, 2010.  The Clerk will issue an appropriate pretrial order in due course.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

[13]Defendants' motion in limine to exclude the testimony of plaintiff's expert, Lou Reiter, is MOOT in part and DENIED in part.  Reiter is a 20-year veteran of the Los Angeles Police Department and the former Chairman of the LAPD Use of Force Review Board.  The court will allow Reiter to testify with regard to accepted police practices and procedures regarding the use of force reports (including the failure to file such reports) and proper training regarding the removal of contraband hidden in an arrestee's mouth.  In addition, Reiter may opine as to whether the prevailing standards for use of force were violated if plaintiff's facts are believed by the jury.  The jury will determine whether it credits Reiter's testimony or not.  The motion in limine is MOOT with regard to any issues pertaining to supervisory liability, as all defendants who served in a supervisory capacity have been dismissed from the case.